William T. Meier, Plaintiff-Appellee, v. Fred Trie-
bold and Viola Triebold, Defendants-Appellants.

Gen. No. 11,186.

Second District, Second Division.

April 29, 1959.

Released for publication May 18, 1959.

Paul E. Thurlow of Joliet, for defendants-appellants.

Krusemark and Bertani, of Joliet (Albert H. Kruse-
mark and John Verklan, of counsel) for plaintiff-
appellee.

JUSTICE SOLFISBURG delivered the opinion of
the court.

This is a suit for injunction and for money damages
stemming from an alleged breach of an oral agree-

ment to permit plaintiff to construct a drainage tile-line across defendants' property. The dispute centers principally about two questions, namely, where the tile-line was to be located and where the water would ultimately be discharged. After the tile was laid the defendants blocked the tile, claiming that the tile was not laid in a line as agreed upon and, further, did not empty out at the agreed place. The plaintiff contended that the blocking of the tile was without justification and that it resulted in the destruction of some of his crops. The plaintiff sought damages for the loss of his crops resulting from defendants' blocking his tile-line, an injunction to prevent defendants from further blocking the line and a mandatory injunction requiring defendants to permit him to connect his tile-line to an outlet in a bulkhead adjoining defendants' fields in the westerly right-of-way of the Calumet Expressway. Defendants filed a cross-complaint or counterclaim for damages to their land, as a result of plaintiff's putting in the tile-line, and for a mandatory injunction requiring plaintiff to remove the tile-line from defendants' land so as to restore their land to its original condition, or else to connect his tile at a proper outlet.

The cause was referred to the master-in-chancery, who after hearing all the testimony offered, found for the plaintiff on all issues. Thereafter, the court entered a decree approving the report of the master and taxing all costs to the defendants. From that decree this appeal is taken.

It is the defendants' theory of the case that plaintiff did not adhere to the terms of the oral agreement, but endeavored to include in it matters which occurred later; that plaintiff's use of one of the outlets in the bulkhead at the Calumet Expressway was not and could not have been part of the original agreement; that the tile-line as laid did not follow the

391

natural contour of the land nor the line agreed upon; that the tile-line which was supposed to benefit the low portions of defendants' farm not only did not benefit the drainage on defendants' farm but, on the contrary, caused considerable damage to the defendants' farm. Defendants assign various errors. However, after a careful review of all points raised by appellants, we find only one requires our attention and consideration, and that is concerned with the facts as found by the master and approved by the chancellor.

Much of the proof is undisputed. Plaintiff, William T. Meier, is the owner of an eighty-acre farm situated in Crete Township, Will County, Illinois. Defendants are the owners of a 160-acre farm immediately south of and adjacent to plaintiff's land. The Calumet Expressway now runs in a generally northerly and southerly direction through the east end of plaintiff's farm and also through the east end of defendants' farm. Prior to September, 1952, the State of Illinois began construction of the Calumet Expressway, and in the State's plans provisions were made for draining water under the highway from drainage tile outletting from plaintiff's and defendants' lands on the westerly portion of the expressway right-of-way. Ultimately, a combination cow underpass and water drain was constructed under the roadway about 900 feet south of defendants' north boundary and, in addition, a fifteen inch drain tile passing underneath the expressway was installed some 500 feet north of the cow underpass.

Many years prior to the time that plaintiff and defendants acquired their farms, a drain tile had been installed running from a slough on plaintiff's property south a short distance into defendants' property and continuing southeasterly toward a point west of where the fifteen inch expressway tile is now situated. Due

392

to its age this tile-line did not adequately drain the slough and, consequently, water would remain on plaintiff's field covering three to four acres and as much as seven to eight or more acres, depending upon precipitation and seasonal changes.

Sometime in the month of May or June, 1952, the plaintiff personally contacted the defendant, Fred Triebold, for the purpose of obtaining permission to construct a new tile-line for the drainage of this slough. According to the defendants, only the plaintiff, William T. Meier, and the defendant, Fred Triebold, were present at this first meeting. Also, according to the defendants' testimony, it was understood between the parties that if the new tile-line were laid it would empty temporarily in a small ravine in the westerly right-of-way of the Calumet Expressway until the expressway was built and then a permanent outlet would be provided under the expressway, carrying the water to the opposite side of the roadway.

Subsequently, the plaintiff, William T. Meier, in the company of his son Melvin, went to the Triebold farm sometime in June of 1952, and again discussed with Triebold, this drainage situation, requesting permission to construct a tile across Triebold's farm to drain the slough. According to Melvin Meier, the defendant, Fred Triebold, agreed to this and said he "would rather see the water coming through the tile than on top of the ground." Thereafter, in July or August of 1952, plaintiff conferred with the defendant, Fred Triebold, regarding the old tile-line and by arrangement met with the defendant, Fred Triebold, one Fred Paul, a neighbor who had previously owned the Meier farm, and the plaintiff's son, Melvin Meier. This group of men first viewed the outlet of the old tile-line on the Triebold farm which was about 400 or 500 feet north of the proposed new outlet. Because this old tile was not adequate and its outlet not suf-

393

ficiently deep, the group went farther south on the Triebold farm to a small existing ravine or ditch which the defendant Fred Triebold, by his own admission, agreed would at least be the temporary outlet for the new drain tile. According to the testimony of the defendant Fred Triebold, he agreed that the new tile-line outlet should be at this existing ravine or ditch, and that when the expressway was built it would be the plaintiff's "job" to put the outlet through the road.

The defendant Fred Triebold claimed that permission to install the new drain line was given on the condition that this tile should extend along a line to take in a low spot on his farm and that plaintiff would notify him when the drain tile was to be installed. It is denied by plaintiff and his son that the outlet was to be temporary and that the tile was to drain any of the defendants' land, although in fact it did so. By his own testimony, defendant stated that he "figured" that plaintiff would drain the low spot on his land when plaintiff installed the new tile-line. The neighbor, a Fred Paul, a disinterested witness, testified that he was satisfied that the plaintiff and the defendant had agreed at this meeting that the outlet for the new drain tile-line would be placed where it is now located.

In September of 1952, plaintiff had the drain tile for the new line, consisting of approximately 1300 feet of eight-inch clay tile, placed along the surface of his land and the defendants' land in a line from the slough on plaintiff's property to a point west of the cow underpass. This tile remained in this position, plainly visible, for more than a month, during which time the defendant, Fred Triebold, saw the tile and admittedly knew that it did not take in any of his low land. The defendant, Fred Triebold, did not go to the plaintiff to object to the direction of the line

of tile but waited, as he said it was agreed, until plaintiff came to him and advised him when the tile would be installed. In fact, the plaintiff did not notify the defendants when the tile was to be installed, but in late October, 1952, the tile was installed along the line in which it had been laid out and entirely at plaintiff's expense. Neither the defendants nor any of their family were present at the time of the installation of the line.

In 1952, the underpass was constructed by the State of Illinois beneath the Calumet Expressway, about 900 feet south of the north boundary of defendants' property. This underpass measured six feet by six feet and was about two feet wider than the ordinary cattle pass so as to accommodate the passage of cattle and drainage waters. After the construction of the underpass, the State, at the request of defendants, constructed a concrete bulkhead west of the underpass to keep the soil from washing into the underpass. In this bulkhead were four outlets with tile inserts. Defendants then had three drain tiles with outlets at or near the cattle underpass, and according to the testimony of plaintiff's witnesses, the three southerly outlets in the bulkhead were to connect to the defendants' three tile-lines, while the northerly outlet had been provided for the new Meier tile-line. This bulkhead was completed in November, 1953, and shortly thereafter defendants' three drain tiles were connected to the three southerly bulkhead outlets. From the time of the construction of the Meier tile-line for a period of more than one year, the new tile drained the Meier slough, all without objection from the defendants. In the fall of 1953, Meier personally went to see Fred Triebold to discuss hooking up his tile outlet with the concrete bulkhead and, according to Meier, Triebold advised him an outlet was being constructed in the bulkhead for the Meier tile and that

395

Meier could connect up to it at any time. This testimony, although disputed by defendants, was confirmed in part by certain testimony of two engineers employed by the State of Illinois. The State of Illinois later constructed a fifteen-inch tile-line beneath the Calumet Expressway, some 400 feet north of the bulkhead, for the purpose of providing an outlet for the old tile-line which had at one time drained the Meier slough, as well as for two additional existing tile-lines. It is the contention of the defendants that the plaintiff, under his agreement, was obliged to use this fifteen-inch tile as an outlet for his new tile-line.

In the spring of 1954, the State hired the same tile man, who had installed the Meier tile, to hook up the defendants' twelve-inch line to the bulkhead and Triebold himself hooked up his other two tile-lines to outlets in the bulkhead. Observing that the three other lines had been connected, plaintiff requested the tile man to hook up his eight-inch line to the fourth bulkhead outlet, but was advised that Triebold had instructed the tile man not to hook up the Meier tile-line. This, according to plaintiff, was the first time that he knew that Triebold was objecting to his use of an outlet in the bulkhead. The defendant suggested that the plaintiff make the outlet for his new tile-line the fifteen-inch tile going beneath the expressway, some 500 feet north of the bulkhead. At the time of the hearing before the master, the fourth or northernmost outlet in the bulkhead which plaintiff sought to use was blank and unused. In August of 1954, the defendant stopped the flow of water in the plaintiff's new drain tile by taking out one of the tiles and inserting concrete blocks. When requested by plaintiff to remove the obstruction, the defendant refused to do so, and finally in November, 1954, the defendant's son removed the cement blocks and put in a connecting drain tile permitting the water to

396

run into the tile-line again. In the meantime, on October 10, 1954, the area experienced one of the heaviest rainfalls in years, and because of the obstruction in the drain tile plaintiff's slough was flooded heavily and did not drain for almost a month, resulting in the loss of crops.

The defendant, Fred Triebold, claimed some damage to crop and fences on his farm by reason of the installation of drain tile on his property by plaintiff. However, there was no proof offered as to the actual monetary loss or cost to restore his farm to its original condition.

The evidence presented by defendants is both confusing and contradictory in itself. The testimony of the plaintiffs and of the neighbor, Fred Paul, is that the tile-line was laid in accordance with the agreement of the parties. In addition, the tiles had been stacked on the open field in the line in which they were ultimately laid. The defendant, Fred Triebold, admittedly saw them and recognized that they did not pass through the low spot on his farm. In fact, the defendant raised no objection whatever to the direction in which the new tile-line was laid until more than a year after the line had been installed. These circumstances militate strongly against defendants' contention that the tile was not laid in accordance with the agreement of the parties. The most that the defendant, Fred Triebold, testified to with reference to the direction of the tile-line was that he "figured" that the new tile-line would extend through the low spot on his farm.

■ ■ Testimony of the plaintiff and his witnesses concerning the agreement to permit plaintiff to place the outlet for his new tile-line in the north tile outlet in the bulkhead is both clear and credible. The fact that the precise specifications of the bulkhead were not conceived until about July, 1953, does not, in our

view, require the conclusion that plaintiff's right to an outlet in the bulkhead or underpass was temporary. The master, who heard the evidence, found that as part of the agreement of the parties the plaintiff was entitled to connect the outlet of his new drain tile to the bulkhead located west of the cow drainage underpass. The chancellor who considered the evidence on exceptions approved the finding of the master. Where the master-in-chancery hears the evidence and makes findings thereon, which findings are approved by the chancellor who considers the evidence on exceptions taken thereto, such findings will not be disturbed by this court unless manifestly against the weight of the evidence, Freymark v. Handke, 415 Ill. 360; Spindler v. Krieger, 16 Ill.App.2d 131. Where there is a dispute as to a material fact, the findings of the master approved by the chancellor must be allowed to stand unless it can be said that such finding is clearly against the weight of the evidence, Ginther v. Duginer, 6 Ill.2d 474. The findings as to the oral agreement of the parties are clearly not against the manifest weight of the evidence. Therefore, those findings will not be disturbed by this court.

The defendants complain that the master and the chancellor erred concerning the measure and proof of the plaintiff's damages. Although plaintiff's proof of damages left something to be desired, nevertheless, in our opinion, the master had before him sufficient evidence to support his findings relating to the extent of plaintiff's damages and the pecuniary loss which he suffered as a result of the blocking of the new tile-line. The defendants also urge that the master erroneously considered the answer to a certain hypothetical question which counsel for plaintiff propounded to the man who had installed the new tile-line concerning the time required to drain a slough under certain conditions. We have carefully considered the

argument made by defendants, but we conclude that the error, if any, was harmless error.

No errors being found, the decree of the Circuit Court of Will County is hereby affirmed.

Decree affirmed.

WRIGHT, P. J. and CROW, J., concur.